# United States Court of Appeals
## For the First Circuit

No. 00-1131
No. 00-1261

GEORGETTE BAGHDADY TILLER,

Plaintiff, Appellant,

v.

SAMI J. BAGHDADY,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Joseph L. Tauro, U.S. District Judge]

Before

Torruella, Chief Judge,
Lynch and Lipez, Circuit Judges.

Donald R. Furman, Jr. for appellant.
Gael Mahony, with whom John D. Lawrence and Hill & Barlow
were on brief for appellee.

March 22, 2001

**LIPEZ, Circuit Judge**.  This unhappy case pits brother against sister.  Sami Baghdady, a property developer in Massachusetts, allegedly used money from the sale of his sisters' Teledyne stock to purchase land for the development of a residential apartments complex in Arlington, Massachusetts, in 1971.  One of the sisters, Georgette Tiller, sued Baghdady on several theories, contending that she was promised a partnership interest in the apartments project, which she never received.  The jury rejected her claim of intentional misrepresentation, the only claim that the court permitted the jury to consider.

In this appeal, Tiller argues that the trial court erred in excluding evidence about Baghdady's disposition of the stock of his other sister, Violette Haddad.  She claims that this evidence would have undermined Baghdady's credibility, leading the jury to accept her version of the events and reject his.  Tiller also challenges the trial court's decision to grant Baghdady's motion for judgment as a matter of law on her claims for breach of an oral contract and negligent misrepresentation.

Although we agree that the court erred in its evidentiary ruling, that error was harmless.  We therefore affirm.

**I.**

**Background**

The Baghdadys are an entrepreneurial family, at one time or another pursuing business ventures on three continents. Sami Baghdady is involved in business investments in the Northeastern United States. For years, Georgette Tiller owned and managed a cosmetics merchandise and bakery business with her sister, Violette Haddad, in Lebanon and locations in Africa. Into the 1980s, Tiller was also responsible for management of a family-owned apartment building in Beirut, and she continues to own real estate in Lebanon. Both Tiller and Haddad now live in the United States. A fourth sibling, George Baghdady, lives in Connecticut.

In 1961, all of the family members invested in a company called ADCOM, which was then run by a family member. When that company was sold in 1967, Baghdady coordinated the swapping of shares for interests in Teledyne, Inc. At the time, Tiller and Haddad were living in Lebanon and the family decided that the stock certificates might not be secure in Beirut. Baghdady agreed to hold them for safekeeping. According to her testimony, Tiller gave explicit instructions to Baghdady regarding the Teledyne stock: "You don't touch these. These are untouchables. These are long-term investment [sic] for my old age." Still, Tiller and Haddad executed Powers of Attorney in

-3-

August 1970, giving Baghdady the authority to manage their investments through the brokerage firm Bache & Company.

Baghdady's and Tiller's accounts diverge on the circumstances of the Teledyne stock sale, as well as the understanding that they reached following the sale. Tiller says that in April 1971, acting pursuant to the powers of attorney, Baghdady sold his sisters' and his own Teledyne shares without notifying them. When Tiller first learned that the shares had been sold in the summer of 1971, during a visit to the United States, she was furious. Tiller says that she asked Baghdady to repurchase the stock, but he replied that he no longer had the money to do so. She further claims that he used the money to purchase the land that would become the Cedar Crest real estate project, a transaction that closed on May 10, 1971. To make amends, Tiller says Baghdady promised to make her and her sister partners in the venture, and he indicated that legal papers would be drafted when he had time. Tiller also acknowledges that following her protest about the sale of her stock, Baghdady executed promissory notes to both Tiller and Haddad on August 4, 1971, just before her return to Lebanon. The note to Tiller stated: "I owe you the sum of (31,000.00) thirty one thousand dollars. This amount, I received from the sale of Teledyne Inc. stock in your name. In the event of my death this debt is

-4-

transferred to my heirs and is to be paid to you from my estate."

Although no legal documents were forthcoming, Baghdady allegedly persisted in characterizing the relationship with his siblings as a partnership. Tiller reports, and her brother George concurs, that during a tour of the Cedar Crest apartments in 1977 Baghdady hailed the property and said to his siblings, "[T]hese are yours. These are the houses you own. Here is your building." There were supposedly multiple conversations about the lack of partnership papers between 1971 and 1996. Finally, in December 1996 when Tiller demanded the papers, Baghdady responded angrily: "There are no papers, no partnership, nothing."

In his defense, Baghdady says Tiller herself was responsible for the stock sale. He states that he only sold his own Teledyne shares, and deposited their value into one of his savings accounts to help with the purchase of the Arlington property. Baghdady also acknowledges that he deposited the proceeds of Tiller's stock sale into one of his savings accounts, at his sister's request, in mid-summer 1971, long after the property purchase was closed. Baghdady states that when Tiller was returning to Lebanon in August, she told him to keep the stock sale amount as a loan. He assured the repayment

-5-

in writing, executing the promissory note acknowledged by Tiller at trial, and writing her a check initiating repayment of the loan.

Over the next decade or so, Baghdady paid the balance of the $31,000, plus interest, to Tiller by sending checks, many of them marked "int." or "interest," on almost a monthly basis. The cost of health insurance premiums that Baghdady was covering for Tiller was sometimes deducted from the interest payments. Although Baghdady did not earn a profit on his real estate investment for several years, Tiller received ongoing repayment of the stock proceeds loaned to her brother. Tiller has never received any percentage of earnings from Cedar Crest, and there was no evidence of Tiller taking part in the venture's management.

Tiller filed a diversity action in federal district court on May 12, 1997, charging fraud and intentional misrepresentation, negligent misrepresentation, and breach of oral contract. The 2 1/2 day trial began on December 6, 1999. At the close of the plaintiff's evidence, the court granted Baghdady's motion for judgment as a matter of law on both the negligent misrepresentation and the breach of oral contract claims. At the conclusion of the case, the court submitted only the intentional misrepresentation claim to the jury. The first

question on the verdict form read: "Has the plaintiff proved by a preponderance of the evidence that the defendant misrepresented to her that she was his partner in the Cedar Crest Apartments development?" The jury responded, "No," obviating the need to answer any further questions. The court entered a judgment for Baghdady.

## II.

## A. Relevance of excluded evidence

At trial, the court refused to allow the admission of documents pertaining to the sale of the Teledyne shares of Violette Haddad, Baghdady's other sister. The plaintiff contends that these documents undermined the veracity of Baghdady's claim that he did not use the money from the sisters' stock sale to purchase the land for his real estate project.

The parties first discussed the admissibility of these documents with the judge the morning the trial began, at a conference immediately preceding the arrival of the jury. At this time, Tiller's attorney, Mr. Tariot, noted the discovery just a few days prior to trial of "Notices of Sale" from Bache & Company for Haddad's stock.[1] Baghdady's attorney, Mr. Mahony,

---

[1] There were three "Notice of Sale" documents at issue: April 19, 1971 in the net amount of $15,724.98; April 21, 1971 in the net amount of $1,486.46; and April 22, 1971 in the net amount of $9,167.81. Ultimately, the April 19, 1971 Notice of Sale became the crucial document from Tiller's perspective. See

objected to the admission of the Haddad documents, arguing that they were not relevant to Tiller's claims relating to her own stock. The court was inclined to agree, but Mr. Tariot persisted: "They are relevant, I believe, in that the dates of transactions are from the same brokerage company of the publicly traded shares and occurred on the identical dates in question relative to my client." He added that they are "probative and relevant to some of the checkbook entries [in Baghdady's account] which are in the agreed exhibits, which show sums of money received from Bache & Company and tally out to the penny to the combination of my client's shares and her sister's shares." Tariot then attempted to show how the checkbook entry listing deposits to Baghdady's account represented the sum of Tiller's and Haddad's stock values. The court remained skeptical, focusing instead on the question of "whether [the amount] was a loan or whether [Tiller] bought a piece of an apartment house." Tariot once again explained: "[T]hese documents are probative as to whether [Baghdady] received the sum in April at the time he was negotiating the purchase [of the land], or August." The court disagreed: "If those [notices of sale] don't mention both people [Tiller and Haddad], I don't see

_____

infra pp. 8, 12.

how it is probative."[2]  The court added, however: "If you reach a point where you think that you have laid a foundation, I will revisit it then."

Accepting this offer, Mr. Tariot attempted twice more to gain the admission of Haddad's sale notices.  The first effort came during Mr. Tariot's examination of Violette Haddad, after her answers established that Baghdady also sold Haddad's Teledyne stock.  The relevant colloquy was as follows:

> MR. TARIOT: This is the juncture at which I would attempt at this time, your Honor, to revisit the issue of documents.
>
> THE COURT: What do they add?
>
> MR. TARIOT: Excuse me?
>
> THE COURT: What do they add?
>
> MR. TARIOT: They add – They are cumulative to the testimony, I expect.
>
> THE COURT: I think unnecessarily cumulative.  I will sustain the objection. If some issue is raised as to the date and fact of sale, then I will let you offer it.

In response to Mr. Tariot's argument that the evidence was cumulative in the sense of adding to the evidence already admitted,   the   court   concluded   that   the   evidence   was

---

[2] Other evidence pertaining only to the sale of Haddad's stock, including Haddad's executed power of attorney and Baghdady's correspondence promising repayment of the stock sale amount, were readily referenced at trial by both parties.

"unnecessarily cumulative" within the meaning of Federal Rule of Evidence 403, which refers to the "needless presentation of cumulative evidence."

The second effort to get the sale notices admitted came during the examination of Sami Baghdady, after Mr. Tariot established that a notation next to a deposit in one of his bank accounts read "Bache & Co. $47,314.34." Mr. Tariot next established that the value of the sale of Tiller's Teledyne stock was $31,589.36. With the help of Baghdady, Mr. Tariot subtracted the value of Tiller's stock from the deposit amount. They arrived at the figure $15,724.98. Mr. Tariot then presented a document that prompted a bench conference at the request of Mr. Mahony:

> MR. MAHONY: We're now coming to the issue, your honor, of documents relating to the sale of Violette's stock.
>
> THE COURT: Yes.
>
> MR. MAHONY: And I have objected on the grounds that it –
>
> THE COURT: It has nothing to do with this case.
>
> MR. MAHONY: It has nothing to do with this case.
>
> MR. TARIOT: If I might be heard, your Honor?
>
> THE COURT: You can make an offer of proof.

-10-

MR. TARIOT: I will.  Consistent with your earlier statement, I can do it in writing, but if I may very briefly be heard?[3]  It comes down to the penny as to what the entry is in his checkbook on the date which precedes – excuse me – which follows the trade date of two days.  It's the same date as the sister's transaction, which he agrees it's [sic] a document in evidence.  The sum of these two numbers is to the penny the entry which goes into the checkbook on that date.

THE COURT: So?

MR. TARIOT: I believe it's probative as to when the sale took place.  The defendant has maintained throughout he never sold these shares – that he got the proceeds sometime in August, and that he never sold them in April of 1971.

After further discussion about when and how Baghdady received the money from the sale of his sisters' Teledyne shares, the court concluded: "I don't know why we're still talking.  I sustained the objection a long time ago."[4]

---

[3] On appeal, the defendant argues that the fact that an offer of proof was never put in writing makes any challenge to the exclusion of evidence impermissible. We disagree.  Federal Rule of Evidence 103(a)(2) does not require that an offer of proof appear in any particular form.  See 21 Charles Alan Wright & Kenneth A. Graham, Jr., Federal Practice and Procedure § 5040 (1977).  In this case, Mr. Tariot adequately explained the substance of the evidence he sought to have admitted.

[4] At this point, the defendant also argued that the evidence in question was not covered by a pre-trial stipulation entered into in June 1998, and thus was not admissible.  The trial was initially scheduled for September 1998.  After a continuance was granted due to an illness, the parties agreed to freeze evidence, pursuant to a stipulation, thereby precluding the

Under Federal Rule of Evidence 401, relevant evidence is "evidence having any tendency to make the existence of any fact that is of more consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. "The district court has broad discretion in making relevancy determinations and we must review its decisions only for abuse of that discretion." United States v. Brandon, 17 F.3d 409, 444 (1st Cir. 1994). However, "a trial court's discretion is not unlimited." Loinaz v. EG & G, Inc., 910 F.2d 1, 6-7 (1st Cir. 1990). A judge abuses this discretion "when a relevant factor that should have been given significant weight is not considered." United States v. Hastings, 847 F.2d 920, 924 (1st Cir. 1988) (quoting United States v. Kramer, 827 F.2d 1174, 1179 (8th Cir. 1987)). We acknowledge that, "[t]here is no neat, standardized test for judging abuse of discretion; each case must be judged on its own facts and circumstances." Loinaz, 910 F.2d at 7; see also

admission of evidence in the delayed trial not identified at that time. Such a stipulation does not necessarily preclude the admission of additional evidence in subsequent proceedings. As we have said, "It was within the discretion of the district court to hold parties to compliance with the pretrial stipulation." Jay Edwards, Inc., v. New England Toyota Distributor, Inc., 708 F.2d 814, 824 (1st Cir. 1983). The court had the option of admitting this evidence if it deemed it relevant. In any event, the court's exclusionary ruling was based on its sense of relevance, not the stipulation, and the issue of the stipulation was never reached.

<u>Espeaignnette</u> v. <u>Gene Tierney Co., Inc.</u>, 43 F.3d 1, 10 (1st Cir. 1994).

Tiller claimed that Baghdady needed the proceeds from the sale of her Teledyne stock and her sister's to purchase the land necessary for his real estate project in May 1971. When she discovered this use of her stock in the summer of 1971, she was furious and told Baghdady so. To mollify her, she says, Baghdady promised for the first time to make her a partner in the real estate project. Baghdady insists that he used his own money to purchase the land, and that he did not borrow the money from his sisters, available from the proceeds of the sale of the Teledyne stock, until mid-summer 1971.

Given this dispute, evidence tending to show that Baghdady secured the stock sale amounts from his sisters immediately prior to the close of his land purchase cannot be characterized as "only tangentially related to the issue at hand." <u>Elgabri</u> v. <u>Lekas</u>, 964 F.2d 1255, 1261 (1st Cir. 1992) (holding that the exclusion of marginally relevant evidence was within the court's discretion). As the plaintiff explains in her brief on appeal:

> [A]dding the April 19, 1971 Teledyne stock sale notices of Ms. Tiller ($31,589.36) and Ms. Haddad ($15,724.98) will sum to $47,314.34. This amount is the exact amount reflected as a deposit in Mr. Baghdady's personal business account. The deposit date

> (April 27, 1971) immediately precedes Mr.
> Baghdady's receipt of deeds evidencing his
> purchase of the real estate on May 10, 1971
> comprising the Cedar Crest project.

This match between the amount of the deposit to Baghdady's account and the combined value of the sale of stock of both sisters is a relevant fact that might prompt a fact-finder to question Baghdady's insistence that he did not use the proceeds from the sale of his sisters' Teledyne stock to purchase the land. Doubt on this point, in turn, might prompt further doubts about Baghdady's account of his business dealings with Tiller. The evidence about the amounts derived from the sale of the sisters' stock is "inseparably intertwined" with the partnership question at issue in this case; the evidence is necessary to "complete the story." United States v. Rosario-Diaz, 202 F.3d 54, 71 (1st Cir. 2000). The Haddad notices of sale were the only evidence establishing the date of the sale of her Teledyne stock prior to Baghdady's land purchase and the precise amount of the proceeds from the stock sale. This evidence was not unnecessarily cumulative. We conclude, therefore, that the trial court erred in excluding the evidence about Haddad's stock sale.[5]

---

[5] Judge Lynch does not agree there was an abuse of discretion in excluding the evidence, particularly after plaintiff's counsel conceded it was cumulative.

## B. Harmless error

An error is harmless when "we can say with fair assurance . . . that the judgment was not substantially swayed by the error." United States v. Gaines, 170 F.3d 72, 82 (1st Cir. 1999) (quoting Vincent v. Louis Marx & Co., Inc., 874 F.2d 36, 41 (1st Cir. 1989)). That is our conclusion here.

First, even if the evidence about the Haddad stock transaction had been admitted, there would have remained uncertainty about when the proceeds from the sale of the sisters' Teledyne stock became available to Baghdady. While the trade dates for the sale of Tiller's Teledyne stock indicate transactions on April 19th and 22nd, there was correspondence to Tiller from Bache & Company dated June 8, 1971 requesting documentation of a power of attorney "[i]n order to complete the transfer" from the stock sale. If, as Baghdady contended, a response to this request was necessary for Tiller or Baghdady to receive money from the stock sale, whenever it may have occurred, this money would not have been available to Baghdady for the land purchase on May 10, 1971. Furthermore, there is no evidence that the April deposit into Baghdady's savings account, alleged to be the value of his sisters' Teledyne stock, was then used to fund the purchase of the land that would become Cedar Crest Apartments.

More importantly, the overwhelming weight of the evidence in this case supports Baghdady's version of this dispute. Tiller only has her account of a few conversations with Baghdady, confirmed by testimony from her brother and sister, over a period of twenty-five years. By contrast, Baghdady has the promissory note he executed for Tiller and accepted by her setting forth her agreement to receive repayment of the $31,000. As the note specifies, "[t]his amount, I received from the sale of Teledyne Inc. stock in your name." At trial, Mr. Mahony painstakingly reviewed with Tiller the series of checks, drafted over more than a decade, which represented the repayment with interest of the loan documented in the promissory note. Based on this substantial evidence, we can say with fair assurance that the jury's verdict against Tiller on her intentional misrepresentation claim was not substantially swayed by the court's error in excluding evidence about the sale of Violette Haddad's Teledyne stock.

## III.

**Motion for judgment as a matter of law**

Tiller claims error in the court's decision to grant a judgment as a matter of law on the claims of breach of oral contract and negligent misrepresentation. Assuming arguendo

-16-

that there was such an error, any error was unmistakably harmless.

In concluding that Baghdady had not "misrepresented to [Tiller] that she was his partner in the Cedar Crest Apartments Development," the jury decided that Baghdady had not told Tiller that she would become his partner. That alleged promise was central to the breach of contract claim. That claim necessarily failed along with the intentional misrepresentation claim. Similarly, a finding of a misrepresentation is a necessary element of both a negligent and intentional misrepresentation claim. See Zuckerman v. MacDonald's Corp., 35 F. Supp. 2d 135, 144 (D. Mass. 1999). The jury's conclusion that there was no misrepresentation necessarily defeats both claims. Thus, any error in keeping the breach of oral contract and negligent misrepresentation claims from the jury was harmless.

**Judgment affirmed.**