# United States Court of Appeals
## For the First Circuit

Nos. 01-1618, 01-1835

GEORGETTE BAGHDADY TILLER,

Plaintiff, Appellant,

v.

SAMI J. BAGHDADY,

Defendant, Appellee.

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Joseph L. Tauro, U.S. District Judge]

Before

Torruella, Circuit Judge,
Stahl, Senior Circuit Judge,
and Lipez, Circuit Judge.

Donald R. Furman, Jr., for appellant.

Gael Mahony, with whom John D. Lawrence and Hill & Barlow,
P.C. were on brief, for appellee.

July 1, 2002

**LIPEZ, Circuit Judge**. Georgette Tiller appeals from the district court's denial of her motion for relief from judgment under Rule 60(b) of the Federal Rules of Civil Procedure. The motion alleged several grounds for relief, among them discovery misconduct and fraud. The district court denied the motion and later rejected Tiller's request for reconsideration. Tiller challenges both decisions. We affirm.

**I.**

We described the facts of the underlying dispute in a previous appeal, and do not repeat them in detail here. See Tiller v. Baghdady, 244 F.3d 9 (1st Cir. 2001) (Tiller I). It suffices to say that the parties disagreed as to the significance of a $31,000 transaction between Tiller and her brother, Sami Baghdady. The $31,000 represents the price of stock Tiller owned in a company named Teledyne, Inc. Tiller alleged that Baghdady sold her Teledyne shares without her consent and used the proceeds to finance his investment in a real estate project known as the Cedar Crest Apartments. Although she admitted at trial that she gave Baghdady a Power of Attorney authorizing him to manage her investments, Tiller maintained that she told him not to sell the Teledyne shares: "You don't touch these. These are untouchables. These are long-term investment for my old age." Thus, when she learned of the sale in the summer of 1971, she was furious and demanded that Baghdady repurchase the Teledyne shares. Baghdady told her that he could not afford to buy back the stock because he had used the $31,000 to purchase the property for the Cedar Crest

-2-

development.  Tiller claimed that Baghdady promised her that he would treat the money as an equity investment, making her a partner in the Cedar Crest Apartments.  When he later reneged on that promise, she sued, alleging (among other things) intentional misrepresentation.

Baghdady told a different story.  He denied promising Tiller a partnership interest in the Cedar Crest apartments.  Instead, Baghdady testified that Tiller sold the Teledyne stock herself.  Once the transaction was complete, she loaned him the $31,000, to be repaid at 10% simple interest, or roughly $250 per month.  In support of that claim, Baghdady produced a hand-written note dated August 4, 1971, in which he pledged to repay a $31,000 "debt" to Tiller.  Another note, dated the previous day, set out the parties' agreement as to interest.  Moreover, Baghdady introduced a series of monthly checks in the amount of $250, marked "Int." or "Interest," -- and a final check for $31,000, marked "For payment of loan dated August 4, 1971" -- all of which had been cashed by Tiller.

At trial, Tiller called her sister, Violette Haddad, as a witness.  Haddad testified that Baghdady had sold her Teledyne stock as well, and that he had attempted to make amends by promising her a partnership interest in the Cedar Crest Apartments.  Haddad maintained that Baghdady had no authority to sell her stock.  On cross-examination, however, defense counsel confronted her with a Power of Attorney, which -- like that executed by Tiller -- authorized Baghdady to sell Haddad's Teledyne shares.  The Power of

-3-

Attorney was signed by Haddad and Baghdady, witnessed by Tiller, and notarized by Baghdady's secretary, Mary Cooper. Haddad confirmed that her signature appeared on the Power of Attorney, although she claimed not to remember signing the document.

Defense counsel also showed Haddad a hand-written letter dated April 18, 1977, in which Haddad represented that she had authorized Baghdady to sell her Teledyne shares and that she had received the proceeds of the stock sale except for $15,000, which she allowed Baghdady to keep as a loan. The note was signed by Haddad and, again, witnessed by Tiller. Haddad confirmed that the signature on the note was hers.

Defense counsel sought to admit both documents into evidence. Tiller's attorney objected that the Power of Attorney was cumulative. The district court disagreed, stating: "There is nothing cumulative. This is impeaching evidence." The 1977 letter was admitted without objection, and defense counsel continued questioning Haddad. After a few minutes, he attempted to introduce into evidence a check from Baghdady to Haddad's son Nicholas. The check had been endorsed by Nicholas, and bore the notation "final payment" on both the front and back. Tiller's attorney objected on the ground that the check, like the Haddad Power of Attorney and the 1977 letter previously introduced, was not "provided under any discovery in this case." Defense counsel explained that he was "responding to information that has just come into the case" -- presumably, Haddad's testimony that Baghdady had sold her Teledyne shares without permission, and used the money to invest in the

Cedar Crest development. The district court overruled the objection.[1]

Tiller took the stand after Haddad. Notwithstanding her sister's testimony to the contrary, Tiller maintained that Haddad's signatures on the Power of Attorney and the 1977 letter were forgeries.[2] She also stated repeatedly that her own signatures, as witness to both documents, had been forged.

At the conclusion of the case, the court submitted Tiller's claim of intentional misrepresentation to the jury. The first question on the jury form asked the jurors to determine whether Tiller had proved by a preponderance of the evidence that

---

[1] The entire colloquy reads as follows:

    MR. TARIOT [counsel for Tiller]: May we approach, your Honor?
    . . . .
    THE COURT: No. Do you have an objection?
    MR. TARIOT: Only in the nature of the fact this is, granted, impeachment evidence, but this was not, nor was [sic] the prior two documents [the Haddad Power of Attorney and the 1977 letter], previously provided under any discovery in this case.
    MR. MAHONEY [counsel for Baghdady]: I don't think, your Honor, the evidence that Mr. Tariot has identified was identified, or which he has been putting in through the witness was identified in the pre-trial proceedings either. I am responding to information that has just come into the case.
    THE COURT: Come into the case? I will overrule the objection.
    MR. TARIOT: Yes, Judge.

[2] Tiller made similar claims regarding the notations on the checks from Baghdady, testifying that Baghdady must have added notations such as "int." or "interest" and "for payment of loan dated August 4, 1971" after Tiller cashed the checks. She maintained that claim in the face of microfiche records from the bank showing that the notations appeared on the checks when they were cashed.

Baghdady misrepresented to her that she was his partner in the Cedar Crest development. The jury answered in the negative, and the court entered judgment for Baghdady on December 21, 1999.

Tiller appealed. She did not raise any issues regarding the production or admission of the Haddad Power of Attorney or the 1977 letter. Instead, she challenged the district court's refusal to admit certain evidence supportive of her claim. We agreed that the court erred in excluding the evidence. See Tiller I, 244 F.3d at 14. We concluded, however, that "the overwhelming weight of the evidence . . . support[ed] Baghdady's version of this dispute." Id. at 15. Accordingly, we held that the district court's error was harmless. Id.

While her appeal was pending in Tiller I, Tiller engaged the services of two handwriting experts. The experts examined the sisters' signatures on the Haddad Power of Attorney and the 1977 letter. Both experts concluded, subject to certain reservations, that it was "probable" that both women's signatures had been forged.

On September 12, 2000 (while her Tiller I appeal was still pending), Tiller filed a motion in the district court seeking relief from the judgment under Rule 60(b). The crux of the motion was that the Haddad Power of Attorney and the 1977 letter were improperly withheld during discovery and, when produced at trial, contained forged signatures. More specifically, Tiller sought relief under Rule 60(b)(1) on the ground that she had suffered unfair "surprise" when Baghdady introduced the two documents at

trial. She also requested relief under Rule 60(b)(2) on the ground that the reports of the two handwriting experts constituted "newly discovered evidence." Finally, Tiller sought relief under Rule 60(b)(3) on the grounds that the documents were forged and therefore constituted "fraud," and that Baghdady's failure to produce the documents during discovery was "misconduct." Fed. R. Civ. P. 60(b)(3) (authorizing relief from final judgment for reasons of "fraud . . . , misrepresentation, or other misconduct of an adverse party").

The district court denied the motion by margin order, and later denied Tiller's request for reconsideration. Tiller appealed, challenging only the district court's judgments with respect to relief under Rule 60(b)(3).[3]

**II.**

In order to obtain relief under Rule 60(b)(3), Tiller had to present the district court with "clear and convincing evidence" that the claimed fraud or misconduct occurred. Anderson v. Cryovac, Inc., 862 F.2d 910, 926 (1st Cir. 1988). Next, she had to show that the misconduct or fraud "substantially interfered with [her] ability fully and fairly to prepare for, and proceed at, trial." Id. In other words, the misconduct or fraud "must have been harmful -- it must have affected [Tiller's] substantial

---

[3] Tiller argues on appeal that she is also entitled to relief under Rule 60(b)(6). That argument was not presented to the district court, and we do not consider it. Teamsters, Chauffeurs, Warehousemen & Helpers Union, Local No. 59 v. Superline Transp. Co., 953 F.2d 17, 21 (1st Cir. 1992).

rights."  Id. at 924 (internal alterations and quotation marks omitted).

On appeal, Tiller faces an additional hurdle.  "When Rule 60(b) is in play, we ordinarily defer to the trial judge's more intimate knowledge of the case."  Id. at 923.  We will upset the district court's judgment only if it represents an abuse of discretion.  "Under this standard, we reverse only if it plainly appears that the court below committed a meaningful error in judgment."  Id.

## A.  Discovery Misconduct

We turn first to Tiller's claim that Baghdady wrongfully withheld the Haddad Power of Attorney and the 1977 letter, in violation of the Federal Rules of Civil Procedure and the district court's discovery orders.  See Fed. R. Civ. P. 26(a).  Baghdady maintains that the documents in question were never requested during discovery and that, in any event, Tiller forfeited her claim of discovery misconduct by failing to object properly to the admission of the evidence at trial, and by choosing not to raise the issue on appeal in Tiller I.

Our cases make clear that the appropriate course for parties who uncover discovery violations is "not to seek reversal after an unfavorable verdict," but to request a continuance "at the time the surprise occurs," United States Fidelity & Guaranty Co. v. Baker Material Handling Corp., 62 F.3d 24, 29 (1st Cir. 1995)

(internal quotation marks omitted),[4] or to seek exclusion of the newly presented evidence under Fed. R. Civ. P. 37(c), see Klonoski v. Mahlab, 156 F.3d 255, 271 (1st Cir. 1998) (explaining that "the appropriate sanction when a party fails to provide certain evidence to the opposing party as required in the discovery rules is preclusion of that evidence from the trial"). Here, Tiller allowed the Haddad Power of Attorney and the 1977 letter to be introduced into evidence without objection. Later, when defense counsel sought to introduce the check from Baghdady to Nicholas Haddad, Tiller argued that the check "was not, nor was [sic] the prior two documents [the Haddad Power of Attorney and the 1977 letter], previously provided under any discovery." Tiller did not ask that the latter documents be excluded as a sanction for discovery misconduct. Nor is it clear that such a request would have been proper, given that the Haddad Power of Attorney and the 1977 letter already had been admitted.

We do not have to determine whether Tiller's belated and somewhat vague objection was sufficient to preserve her claim of discovery misconduct for appeal, however, because Tiller failed

_____

[4] Although requesting a continuance may often be an appropriate response to surprises at trial, a continuance can be problematic when the requesting party needs to engage the services of an expert witness in order to respond to the surprise. That engagement can take time, and courts are understandably reluctant to countenance lengthy delays in jury trials. It is unclear whether delay would have been a problem in this case, as Tiller already had retained a handwriting expert to examine documents Baghdady produced during discovery. Nevertheless, we do not have to decide whether a continuance would have been appropriate here. As explained in the text, we conclude that Tiller forfeited her claim of discovery misconduct by failing to raise it in her first appeal.

entirely to pursue that claim in <u>Tiller I</u>.  Indeed, she did not so much as mention the issue of discovery misconduct in her first appeal.  We have held that Rule 60(b) cannot be used as a "substitute for a timely appeal under Rule 4(a)(1) of the Federal Rules of Appellate Procedure."  <u>Ojeda-Toro</u> v. <u>Rivera-Mendez</u>, 853 F.2d 25, 28 (1st Cir. 1988).  Tiller has offered no reason why she needed to wait nearly nine months after the entry of judgment before raising her claim of discovery misconduct.  We conclude that she forfeited that claim by failing to present it on direct appeal.[5]  Accordingly, we express no view as to whether Baghdady's failure to produce the Haddad Power of Attorney and the 1977 letter during discovery  violated the Federal Rules of Civil Procedure or the district court's orders.

## B.  **Fraud**

We turn, then, to Tiller's claim that Baghdady forged the signatures on the Haddad Power of Attorney and the 1977 letter. Baghdady maintains that Tiller forfeited that claim as well. Tiller, he points out, "knew" in her mind that the documents were forged from the moment they were introduced.  Nevertheless, she did not present her claims of fraud to the district court at that time, beyond her own assertion of forged signatures.  Rather than seeking

---

[5] We note that Tiller seems to have conceded the point in her reply brief:  "The Appellee's Brief asserts that '[h]aving failed to seek relief for the alleged discovery misconduct at trial and in the first appeal, Ms. Tiller is barred by waiver and res judicata from making that claim now.' . . . Mr. Baghdady is correct. . . . The 'relief' sought by Ms. Tiller in this appeal, however, is for the perpetration of a fraud.  The discovery misconduct . . . simply facilitated the fraud."

a continuance, a mistrial, or the exclusion of the purportedly fraudulent evidence, Tiller made a "conscious decision" to go forward on the perceived strength of her own testimony that the documents were forged. Parrilla-Lopez v. United States, 841 F.2d 16, 19 (1st Cir. 1988). In such circumstances, Baghdady argues, Tiller should not be permitted to upset the judgment under Rule 60(b)(3). See Ojeda-Toro, 853 F.3d at 29 ("[A] party may not prevail on a Rule 60(b)(3) motion on the basis of fraud where he or she . . . has knowledge of inaccuracies in an opponent's representations at the time of the alleged misconduct.").

We need not decide whether Tiller forfeited her fraud claim because it is clear that she does not qualify for relief under Rule 60(b)(3). As noted, in order to prevail under that provision, Tiller was required to establish fraud[6] by clear and convincing evidence. She has not met that burden.

Tiller's motion relied on the reports of two handwriting experts, both of whom examined the Haddad Power of Attorney and the 1977 letter. The first expert, Pauline Patchis, completed her

[6] Although we have not had cause to delineate the precise boundaries of the term "fraud" in Rule 60(b)(3), we have observed that it need not rise to the level of "fraud upon the court," as required to maintain an independent action under the savings clause of Rule 60(b), see Fed. R. Civ. P. 60(b) ("This rule does not limit the power of a court to . . . set aside a judgment for fraud upon the court."). Reintjes Co., Inc. v. Riley Stoker Corp., 71 F.3d 44, 48-49 (1st Cir. 1995) (concluding that allegations of "ordinary fraud" such as perjury may be raised in a timely-filed motion for relief under Rule 60(b)(3), but are insufficient to support an independent action for fraud on the court). It seems clear -- and Baghdady does not argue to the contrary -- that intentionally presenting forged documents would constitute "fraud" within the meaning of Rule 60(b)(3).

-11-

report in January 2000, shortly after the conclusion of the trial. Patchis evaluated Haddad's signatures on copies of the two challenged documents, comparing them to a copy of Haddad's signature on her passport, dated June 1992. Based on that examination, Patchis offered her "preliminary" opinion that the two Haddad signatures "were not, in all probability, authored by the 'known' writer" of the signature on the 1992 passport. "In order to be more conclusive," however, she stressed the need for original documents, "along with additional 'known' signatures attributed to Violette Haddad, preferable [sic] in the 1970 time frame."

The second expert, Charles Shure, issued his report eight months later. Shure was asked to examine the signatures of both Haddad and Tiller on the Haddad Power of Attorney and the 1977 letter. He, too, based his evaluation on copies of the women's signatures. With respect to the 1977 letter, Shure offered his "professional opinion,[7] subject to applicable limitations imposed by copy viewing plus the number and date of available [signatures for comparison], that it is:

> 1. Probable that the questioned 'Violette Haddad' signature was written by another person.
> 2. At least more likely than not that the questioned signature 'Georgette Tiller' was written by another person."

_____

[7] Shure inserted an asterisk before the word "opinion" each time it appeared on his report. It is unclear, however, what those notations were intended to mean.

Shure's opinion was the same for the Haddad Power of Attorney, except that he concluded that it was only "[m]ore likely than not" that Haddad's signature had been forged on that document.

Shure "reserve[d] the right to re-evaluate any or all of the above opinion components pending [an] examination of additional and/or better (up to including original) evidence should such become available to [him]." He added that "[i]mplementation of this procedure, if possible, is particularly recommended for the questioned document[s]."

As they stand, the expert reports do not establish clear and convincing evidence of forgery. Both experts expressed only a preliminary opinion that it was "probable" that the signatures on the Haddad Power of Attorney and the 1977 letter were forged. Both made clear that they could not render conclusive findings on the materials Tiller provided them. Both requested access to the original documents, and stressed the need for original signatures -- or at least more copies -- to use as samples. Patchis made that request in January 2000. Tiller ignored it. Instead, purportedly "to remove doubt before expending the time of the lower court," Tiller consulted Shure to obtain a second opinion. Yet, despite having been advised by Patchis of the need for originals, or at least copies from the same time frame as the signatures under review, Tiller failed to give Shure even an original of her own signature. Nor does it appear that she provided him with samples of a sufficient "number," or from an ideal "date," despite the fact that her own signature can be found more than fifty times in the

-13-

exhibits the parties submitted at trial -- including on several checks from the 1970s.

Moreover, the experts' tentative conclusions are flatly contradicted by the testimony of Tiller's own witness. At trial, Haddad stated unequivocally that the signature on the Power of Attorney and the 1977 letter was hers. In an effort to avoid the weight of that testimony, Tiller argues that Haddad meant only that her name had been written on both documents, not that she had in fact signed them. However, Haddad's testimony makes clear that she understands the difference between a name and a signature. During cross-examination, defense counsel asked Haddad whether her signature appeared on the 1977 letter. Haddad answered, "[t]hat is my signature, yes." Defense counsel then asked, "[a]nd is that your sister, Georgette's, signature?" Haddad answered, "I don't know. You will ask her. . . . I don't know it is her signature."

Perhaps recognizing that her own showing is insufficient to merit relief under Rule 60(b)(3), Tiller argues that we should presume fraud because Baghdady did not hire handwriting experts to refute the charge of forgery, and because neither he nor Cooper (who notarized the Haddad Power of Attorney) submitted an affidavit stating that the disputed signatures were authentic. That argument ignores that Tiller, not Baghdady, bears the burden of proof of proving fraud. In light of the inconclusive nature of Tiller's expert reports, it is hardly surprising that Baghdady opted to forego the expense of retaining his own handwriting expert. Nor was he under any obligation to buttress his opposition with

-14-

affidavits.  Both Baghdady and Cooper denied the charges of fraud at trial, under oath.

Given our conclusion that Tiller failed to prove fraud by clear and convincing evidence, we need not consider whether the alleged wrong "substantially interfered" with her ability to prepare for and proceed at trial.  <u>Anderson</u>, 862 F.2d at 926.  We hold that the district court did not abuse its discretion in denying Tiller's Rule 60(b)(3) motion.

### III.

Tiller argues that the district court abused its discretion in refusing to reconsider its judgment in light of our decision in <u>Tiller I</u>.  The district court denied Tiller's Rule 60(b) motion on March 19, 2001.  We decided <u>Tiller I</u> three days later.  On April 20, 2001, Tiller moved the district court to reconsider its denial of her Rule 60(b) motion, invoking our opinion in <u>Tiller I</u> as an additional ground for relief.[8]  The district court rejected that motion as well, again by margin order.

Requests for reconsideration are committed to the sound discretion of the district court.  "An appellate court ought not to overturn a trial court's denial of a motion for reconsideration unless a miscarriage of justice is in prospect or the record otherwise reveals a manifest abuse of discretion."  <u>Ruiz Rivera</u> v.

---

[8] The motion to reconsider made no mention of Fed. R. Civ. P. 60(b)(6) (authorizing relief from judgment for any reason not listed in subsections (1) through (5)), and we reject Tiller's suggestion that we should treat it as a motion under that provision.

<u>Riley</u>, 209 F.3d 24, 27 (1st Cir. 2000).  We find no abuse here, manifest or otherwise.  As we explained above, Tiller was not entitled to relief under Rule 60(b)(3) because she failed to establish fraud by clear and convincing evidence.  Nothing in <u>Tiller I</u> suggests otherwise.

**<u>Affirmed.</u>**