**UNITED STATES of America,**
Appellee,

v.

**José AMADO–NÚÑEZ, Defendant,**
Appellant.

No. 01–2709.

United States Court of Appeals,
First Circuit.

Heard Nov. 5, 2003.
Decided Feb. 6, 2004.

Laura Maldonado–Rodríguez, by appointment of the court, for appellant.

Thomas F. Klumper, Assistant United States Attorney, with whom H.S. García, United States Attorney, and Sonia I. Torres–Pabón, Assistant United States Attorney, Chief, Criminal Division, were on brief for appellee.

Before BOUDIN, Chief Judge,
TORRUELLA and LYNCH, Circuit Judges.

BOUDIN, Chief Judge.

This is an appeal by José Amado–Núñez following his conviction for transporting counterfeit tax stamps in interstate or foreign commerce. 18 U.S.C. § 2314 (2000). The appeal presents two issues, one evi-

dentiary and the other of statutory construction. The background is as follows.

On November 25, 1999, Amado went through the primary customs screening point at the Luis Muñoz Marin International Airport in San Juan, Puerto Rico. The later indictment described Amado as arriving on a flight from the Dominican Republic, but the prosecutor neglected to prove the origin point at trial. The inspector at the primary customs point randomly chose Amado for a more thorough examination and he was directed to a second inspector.

In the bottom of Amado's bag, the second inspector found packages of stamps that purported to be issued by the Puerto Rico Department of the Treasury. The inspector summoned a criminal investigator assigned to the customs service who, on examining what she believed to be tax stamps for coin-operated machines, noticed that many had duplicate serial numbers—which she did not think would occur if the stamps were genuine.

Questioned by the agent, Amado said that he owned coin machines for his business in Puerto Rico but gave inconsistent answers as to how many machines he owned. He did not answer directly when asked about the origin of the stamps. Nor, when requested, did he provide any proof of purchase or other documents regarding the origin of the stamps. The agent took custody of 887 stamps, which were later determined to be counterfeit.

A federal grand jury indicted Amado for violating 18 U.S.C. § 2314 (2000). The third paragraph of this statute pertinently provides:

Whoever, with unlawful or fraudulent intent, transports in interstate or foreign commerce any falsely made, forged, altered, or counterfeited securities or tax stamps, knowing the same to have been falsely made, forged, altered, or counterfeited ... [s]hall be fined under this title or imprisoned not more than ten years, or both.

Exceptions appear in the final paragraph of section 2314 but none is claimed to be relevant in this case.

Amado was tried for this offense in a bench trial, consented to by both sides. Together with evidence of the initial seizure, the government presented (among other witnesses) several officials from the Puerto Rico Treasury Department who testified about the tax stamp regime in Puerto Rico and confirmed that the stamps in question were counterfeit. The defense presented no witnesses but preserved the objections raised on appeal by appropriate motions.

At the close of the case, the district judge determined that Amado was guilty of the offense charged; the oral decision from the bench was brief, but the district court had already addressed in writing a legal issue now raised on appeal. *United States v. Amado Nunez*, 141 F.Supp.2d 230 (D.P.R.2001). Thereafter Amado was sentenced to two years imprisonment. Amado now appeals, raising two arguments: that the evidence does not establish the interstate or foreign commerce element of the offense, and that the statute does not apply to the stamps in question.[1]

■ The evidentiary issue is easily framed. The prosecutor failed to offer direct evidence that Amado had arrived at the airport from the Dominican Republic or, indeed, from any foreign point. So, indulging inferences in favor of the verdict, *see United States v. Perrotta*, 289 F.3d

1. Amado does not deny that the stamps were counterfeit and he does not contest two other elements of the statute, namely, that he acted "with unlawful or fraudulent intent" while "knowing" that the stamps were counterfeited.

155, 160 (1st Cir.2002), the question is whether, from other fragments of evidence, a trier of facts could rationally conclude beyond a reasonable doubt that Amado had arrived from outside Puerto Rico. *See United States v. Henderson,* 320 F.3d 92, 102 (1st Cir.2003).

The issue can be narrowed further. In describing the initial inspection of Amado's luggage, the inspector who found the stamps explained that her duties consisted of interviewing passengers and searching their luggage. She also made clear that she was talking about *arriving* passengers, saying: "We have to ask them where they come from, how long they stayed in whatever place they went, if they acquired any items in the place where they were visiting."

She also made it clear that Amado had gone through this process. After describing the primary and secondary inspection points, she said that Amado had presented himself at her secondary point and, when asked what she did when coming in contact with him, she described in generic terms the process of requesting the customs declaration card, asking the regular questions (such as "where are you coming from"), and searching the luggage. She then described the search of Amado's luggage and discovery of the stamps.

Based on this evidence, we think a trier could rationally conclude beyond a reasonable doubt that Amado had gone through this process as an arriving passenger from whom a customs declaration form is requested, who is asked about his origin point, and whose luggage is often or ordinarily searched upon arrival. The only remaining link in the chain is the proposition that passengers arriving from a foreign origin go through the customs process while domestic passengers do not; without this link Amado could have been arriving from a flight originating elsewhere in Puerto Rico, defeating the interstate or foreign commerce requirement.

That routine customs checks are done for foreign but not domestic flights is known to anyone who has done even a modicum of air travel; it is also known to many others who have merely met arriving friends and relatives or who have watched films or television programs or read books or newspapers that touch on air travel. Its truth can also be deduced, though this is quite a different matter, from a study of federal statutes, regulations governing customs inspections and reported decisions.[2]

A federal court can take judicial notice of "adjudicative facts"—facts about the parties or events involved in the case—if one of two tests is met and if the parties are given notice, Fed.R.Evid. 201. But that rule is irrelevant here because the practice of customs searches for foreign but not domestic arrivals is not an adjudicative fact, and Rule 201(b)'s limits do not apply to the vast array of "background" facts commonly considered by judges and juries in deciding cases. *See* Fed.R.Evid. 201(a) & advisory comm. note to 201(a).

These "background" or "evaluative" facts cover the whole range of human experience from the rough meaning of common terms ("city") to science (a full moon illuminates a scene) to human psychology

---

2. *E.g.,* 19 U.S.C. §§ 1461, 1496, 1582 (2000); 19 C.F.R. §§ 148.21, 162.6 (2003); *United States v. McKenzie,* 818 F.2d 115, 117–120 (1st Cir.1987); *cf. United States v. Ramsey,* 431 U.S. 606, 616, 97 S.Ct. 1972, 52 L.Ed.2d 617 (1977); *United States v. Thirty-Seven Photographs,* 402 U.S. 363, 376, 91 S.Ct. 1400, 28 L.Ed.2d 822 (1971) ("[A] port of entry is not a traveler's home.... Customs officials characteristically inspect luggage and their power to do so is not questioned in this case; it is an old practice and is intimately associated with excluding illegal articles from the country.").

(a witness who is related to one of the parties might be biased). *Id.* For example:

> When a witness says "car," everyone, judge and jury included, furnishes, from non-evidence sources within himself, the supplementing information that the "car" is an automobile, not a railroad car, that it is self-propelled, probably by an internal combustion engine, that it may be assumed to have four wheels with pneumatic rubber tires, and so on. The judicial process cannot construct every case from scratch, like Descartes creating a world based on the postulate Cogito, ergo sum. These items could not possibly be introduced into evidence, and no one suggests that they be.

Fed.R.Evid. advisory comm. note to 201(a); *see also* Mueller & Kirkpatrick, *1 Federal Evidence* § 57 (2d ed.1994); John H. Mansfield, *Jury Notice,* 74 Geo. L.J. 395 (1985).

Fact-finders rely upon such background references or propositions all the time in deciding whether something did or did not happen; and this is permissible, without resort to the machinery for noticing adjudicative facts. The background facts may be quite important, but by contrast to adjudicative facts, the parties do not have an advantage over the jury in access to evidence about them. This does not, of course, preclude the possibility of parties' seeking to offer evidence about them when they are important. *Cf. 1 McCormick on Evidence* § 206(c) (5th ed.1999).

The level of reliability required is not often discussed in the cases; only rarely can an appeals court be sure (as we are here) that a specific background proposition was employed or, in the alternative, was logically necessary to the result. But refinement of the standard is unnecessary in this case, because we are certain enough that the proposition in this case—formal customs inspections are only for passengers arriving from foreign countries—is both familiar and true. So, there is no reason to worry here about whether and when a more vulnerable alleged background fact might be subject to attack.

Thus, the ultimate fact (that Amado arrived from a foreign country) did not need to be "judicially noticed" under Rule 201; rather, it could (quite easily) be inferred by the fact-finder from the background fact of general customs-service practice coupled with trial evidence that, on this occasion, Amado was interviewed at the secondary arrival customs inspection point and then was questioned and searched in the fashion described by the inspector and agent (both adjudicative facts but amply proved by evidence).

The same process of reasoning disposes of a variant theory offered by Amado to raise a reasonable doubt as to the commerce element, namely, that he might have been searched, regardless of whether he had traveled at all, by a customs-service representative patrolling the airport. There are other problems with this competing explanation but the evidence already described disposes of it without more: the testimony of the agent at the secondary arrival point makes clear that Amado was searched as an arriving passenger at a formal checkpoint and not through some random stop in the concourse.

■ Amado's second claim of error is of a different character. He argues that the items seized from his suitcase were not tax stamps within the meaning of 18 U.S.C. § 2314 (2000). The argument rests on a double premise: that the statute applies only to "property" and that a tax stamp is merely a "license" from the state that is not property and does not come within the

statute. The claim turns on questions of law which we consider *de novo*. *See United States v. Paradis*, 351 F.3d 21, 28 (1st Cir.2003).

The nature of Amado's counterfeit stamps was established at trial by uncontradicted evidence. Puerto Rico levies an excise tax in the amount of $1,500 per year on coin-operated "adult entertainment machines." 13 P.R. Laws Ann. § 9057(a)(2)(E) (2000). The $1,500 yearly payments are described by the statute as "annual taxes for license fees." *Id.* § 9057(a). Proof that a license was obtained must be displayed on each entertainment machine. *Id.* § 9057(b). The testimony was that the revenue department issues "stamps" or "decals" along with the license; one stamp is placed on each machine to show that the tax has been paid. The items seized from Amado's suitcase were crude counterfeits of just such stamps.

Still, Amado says that they were not "tax stamps." The first premise of Amado's argument is that the statute under which he was charged, 18 U.S.C. § 2314, applies only to "property." This may be true of the first and second paragraphs of section 2314, which deal respectively with stolen "goods, wares, merchandise, securities or money" and with schemes to obtain "money or property" by fraud; but the third paragraph under which Amado was convicted says nothing about property: by its terms it applies to "falsely made, forged, altered, or counterfeited securities or tax stamps." *Id.*

The language dealing with tax stamps was added separately to the federal statute in 1961, *see* Pub.L. No. 87–371, § 2, 75 Stat. 802 (1961), after state officials testified in Congress that counterfeit state tax stamps were being brought across state lines. S.Rep. No. 1086 (1961), *reprinted in* 1961 U.S.C.C.A.N. 3264, 3264–66; *Amado*, 141 F.Supp.2d at 234 (summarizing legisla-

tive history). The amendment was accompanied by a companion section defining "tax stamp" as including "any tax stamp . . . or any other form of evidence of an obligation running to a State, or evidence of the discharge thereof." Pub.L. No. 87–371, § 1, 75 Stat. 802 (1961) (codified at 18 U.S.C. § 2311 (2000)).

Even without the statutory definition, we would readily construe "tax stamp" as a stamp evidencing the discharge of a tax obligation. A conventional dictionary definition of revenue stamp describes it as "[a] stamp used as evidence that a tax has been paid." *Black's Law Dictionary* 1320 (7th ed.1999). This is just what the testimony showed Amado's stamps to be, or more precisely to resemble, since they were counterfeit versions.

Amado argues that the tax stamps in this case were themselves "licenses"; the statute requires licenses showing that the tax has been paid to be posted visibly on each machine. It is true that the English translation of the Puerto Rico revenue statute refers only to "licenses," not "stamps." 13 P.R. Laws Ann. § 9057 (2000). But whether or not a tax stamp comprises the necessary license or merely evidences it, it remains a tax stamp under the definition provided by federal law and common usage.

The reason that Amado argues that these stamps are licenses is to invoke the Supreme Court's decision in *Cleveland v. United States*, 531 U.S. 12, 121 S.Ct. 365, 148 L.Ed.2d 221 (2000)—a decision dealing with a different statute and different problem. In *Cleveland*, the defendant secured a video poker license from Louisiana by making false statements in his license application. The question in the Supreme Court was whether this conduct came within the federal mail fraud statute, 18 U.S.C. § 1341 (2000), which (primarily)

makes criminal the obtaining of "money or property" by fraud.

The Supreme Court held that an as yet unissued video poker license in the hands of a state official was not itself "money or property" under the terms of section 1341. *Cleveland*, 531 U.S. at 20, 121 S.Ct. 365. Amado argues that *Cleveland* protects him because the tax stamps in his case were (counterfeit) licenses. But *Cleveland* merely held that an unissued license was not *property* under the terms of the mail fraud statute.[3] The third paragraph of section 2314 deals with counterfeit *tax stamps* and, whether or not Amado's stamps are described as "property," they are certainly counterfeit tax stamps and expressly covered by the statute of conviction.

*Affirmed.*

---

3. Whether a license might be property *after* its receipt was a question the Court did not reach (since Cleveland committed his fraud before the license was issued), although the Court did note that licenses are at least occasionally "property" in the hands of private citizens. *Cleveland*, 531 U.S. at 25 n. 4, 121 S.Ct. 365.