# United States Court of Appeals
## For the First Circuit

No. 03-1954

INVESSYS, INC. and PETER HODGES,

Plaintiffs, Appellants,

v.

THE McGRAW-HILL COMPANIES, LTD. and
THE McGRAW-HILL COMPANIES, INC.,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. George A. O'Toole, Jr., U.S. District Judge]

Before

Boudin, Chief Judge,

Cyr, Senior Circuit Judge,

and Howard, Circuit Judge.

Douglas H. Wilkins with whom Anderson & Kreiger LLP was on brief for appellants.
John D. Donovan, Jr. with whom Crystal D. Talley, Levina Wong and Ropes & Gray LLP were on brief for appellees.

May 21, 2004

**BOUDIN**, **Chief Judge**.    Defendants--The McGraw-Hill Companies, Ltd., and The McGraw-Hill Companies, Inc. (together "McGraw-Hill")--successfully defended themselves against a lawsuit brought by plaintiffs InvesSys, Inc. ("InvesSys"), and Peter Hodges.  One of the claims in the complaint was for copyright infringement and, at the end of the case, the district court awarded attorney's fees and costs to McGraw-Hill under the Copyright Act.  17 U.S.C. § 505 (2000).  Plaintiffs now appeal, contesting the award.

The background facts are as follows.  During the spring of 2000, McGraw-Hill became interested in selling a subsidiary called Micropal Accounting Portfolio Services, Inc. ("MAPSI"). MAPSI's primary business was the licensing and support of a Windows-based software program called "MaPS."  Hodges, who was an employee of the McGraw-Hill subsidiary that owned MAPSI–Standard & Poor's Fund Services, Inc. ("S&P")--expressed interest in purchasing MAPSI.

Negotiations between Hodges and McGraw-Hill for the sale of MAPSI began in the fall of 2000.  The lead negotiator for McGraw-Hill was Kevin Thornton, then the managing director of S&P. At some point in the negotiations, Hodges requested that MaPS's DOS-based predecessor programs be included in the deal.  Thornton agreed, and, because the additional programs Hodges sought were

considered obsolete, directed that they be added to the terms of a draft sales agreement for no additional consideration.

When McGraw-Hill's lawyer (Susan Winter) added the predecessor programs to the draft agreement, she also included a program called "AIM," which was not obsolete, was not a part of the MaPS line of programs, and in fact generated millions of dollars in revenue for McGraw-Hill.[1] Hodges had expressed interest in the AIM program to McGraw-Hill manager Adrian Manning, who had referred Hodges to Thornton. Hodges would later claim that he spoke with Thornton about AIM and obtained his agreement to include the program in the deal; Thornton would deny that Hodges ever approached him about AIM.

The draft agreement--including its reference to the AIM program--was reviewed several times by Thornton and other McGraw-Hill officials before it was executed by the parties on May 29, 2001. The final purchase price was $19,600, and no McGraw-Hill official raised any objection to the specification of the AIM program as among those being transferred. After the sale was completed, Hodges conveyed his rights to MAPSI and AIM to InvesSys.

---

[1]Both MaPS and AIM were performance-measurement tools, but they performed different functions and used different information. MaPS was a management and accounting system that was designed primarily to allow users to keep track of a portfolio of fixed income investments through the periodic entry of data, such as the price at which a particular security was acquired. By contrast, AIM allowed users to analyze and compare data (separately supplied by S&P) relating to some 60,000 mutual funds worldwide. The two programs were marketed and supported separately.

Hodges is InvesSys's sole shareholder, sole officer, sole director, and sole employee.

On August 2, 2002, Hodges called Thornton to arrange a meeting for the following day. At the meeting, Hodges asked Thornton for access to data feeds that were necessary to market the AIM software. Thornton claimed that he had not been aware that AIM had been included in the terms of the sales agreement. After examination of the document, McGraw-Hill took the position that, under New York law, inclusion of AIM was a scrivener's error and maintained that it still owned the rights to AIM.

On November 26, 2001, Hodges and InvesSys filed suit against McGraw-Hill in the federal district court for the district of Massachusetts. The suit alleged copyright infringement--a federal claim under the Copyright Act--as well as breach of contract and a medley of other state law claims (fraud, conversion, and claims under Mass. Gen. Laws ch. 93A). Because the parties agreed that the scrivener's-error issue was central, the district court directed that only the state law claims proceed to trial, the copyright claim being held in abeyance.

At trial, the principal witnesses were Hodges, Winter, Manning, and Thornton. The gist of plaintiffs' case was that there had been a knowing sale of AIM by McGraw-Hill; defendants' position was that inclusion of AIM was patently a scrivener's error by Winter and that the parties' true intentions required reform of the

contract to exclude AIM under well established legal doctrine. See George Backer Mgmt. Corp. v. ACME Quilting Co., 385 N.E.2d 1062, 1066 (N.Y. 1978); 7 Corbin on Contracts § 2845 (rev. ed. 2002).

After the close of evidence, the court presented the jury with a single initial question:

> Have the defendants proven by clear and convincing evidence, that the inclusion of 'AIM' in . . . the Share Purchase Agreement was a scrivener's error that did not reflect the actual agreement of the parties?

The jury answered "yes," and the district court entered judgment for McGraw-Hill on all claims, including the claim of copyright infringement. Thereafter, the court awarded McGraw-Hill $200,000 in attorney's fees and $28,583.78 in costs under section 505, finding that plaintiffs' claim of copyright infringement was objectively unreasonable and improperly motivated.

In its award, the district court declined to make any reduction despite plaintiffs' claim (and defendants' admission) that much, if not all, of the legal work performed in the case had application to the state law claims as well as the copyright claim. The district court included in its award payments by defense counsel for computer-assisted legal research. The court also made the award run against Hodges personally as well as InvesSys. Plaintiffs now appeal, challenging the award itself and each of the ancillary rulings.

Section 505 provides:

> In any civil action under this title, the court in its discretion may allow the recovery of full costs by or against any party other than the United States or an officer thereof. Except as otherwise provided by this title, the court may also award a reasonable attorney's fee to the prevailing party as part of the costs.

Unlike most fee-shifting statutes, section 505 allows attorney's fees to be awarded to defendants on an "even-handed" basis with plaintiffs. Fogerty v. Fantasy, Inc., 510 U.S. 517, 534 (1994); Lotus Dev. Corp. v. Borland Int'l, Inc., 140 F.3d 70, 72-73 (1st Cir. 1998). Fogerty said that the award rested in "the [trial] court's discretion" and that there was no formula, but that factors that could be taken into consideration included inter alia the objective unreasonableness of the losing side's position. 510 U.S. at 534 & n.19.

Although fee awards are nominally reviewed on appeal for "abuse of discretion," Matthews v. Freedman, 157 F.3d 25, 29 (1st Cir. 1998), an award can also depend on legal issues that are reviewed de novo. See United States v. Padilla-Galarza, 351 F.3d 594, 597 & n.3 (1st Cir. 2003). Plaintiffs' broadest position, which falls in the latter category, is that no award was permitted because the trial was directed only to state law claims and turned on a state law issue; at the very least, say plaintiffs, the costs had to be allocated and that most concerned the ownership issue rather than anything peculiar to copyright.

-6-

The statute, drafted with claims under the Copyright Act in mind, does not expressly address the problem of a case with a mix of claims. However, here a federal copyright claim was asserted in the complaint, so this is literally a "civil action under this title [the Copyright Act]," 17 U.S.C. § 505; and the case law has used common sense to carry out Congress' underlying intent to provide for attorney's fees in copyright enforcement or like matters but not for other civil claims that do not involve copyright. See Entm't Research Group, Inc. v. Genesis Creative Group, Inc., 122 F.3d 1211, 1230-31 (9th Cir. 1997), cert. denied, 523 U.S. 1021 (1998).

Implementing that intent presents the recurring problem of form versus substance. The only claims posed for trial were state law claims (most importantly, a contract claim) and the only issue decided was ownership of AIM, turning on state law rules as to contract and reformation. Ownership of a copyright is a predicate to a federal copyright claim, see 17 U.S.C. § 501(b); Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361 (1991), but the rules governing contractual transfer of ownership have been left (for the most part) to state law.[2]

---

[2]See, e.g., Walthal v. Rusk, 172 F.3d 481, 485 (7th Cir. 1999); 1 Nimmer on Copyright § 101(B)(3)(a) (2003) ("[I]t remains true that the vast bulk of copyright contractual issues must be resolved under state law, given the silence of the Copyright Act in addressing such issues as . . . how to construe ambiguous contractual language . . . .").

-7-

Yet the question of ownership of AIM was common to both the plaintiffs' claim under the Copyright Act and their claims under state law. If plaintiffs lost as to ownership, all claims failed. The fact that the district court chose to extract this common issue and try it first, nominally deferring the copyright claim, does not alter the fact that the copyright claim was in the case and depended on the ownership issue being tried. Had plaintiffs' complaint set forth only the copyright claim, exactly the same contractual issue would have had to be tried.

Had plaintiffs never asserted a copyright claim but only claims under state law, it would be hard to describe this as a "civil action under" that statute. But here a copyright claim was made, thereby permitting Copyright Act remedies, and the issue actually litigated was necessary to the assertion of that claim. So it serves Congress' purpose to compensate the winning side for attorney's fees and costs. C.f. Maljack Prods., Inc. v. Goodtimes Home Video Corp., 81 F.3d 881, 884-86, 889 (9th Cir. 1996).

Plaintiffs argue that because the ownership issue is governed by state law, it cannot carry out "the purposes" of the Copyright Act to award attorney's fees and costs. We think this is too cramped a reading of the statute. On the contrary, in section 505 Congress aimed to provide a potential incentive to the winner who asserts a successful copyright claim or defends against an unworthy one. This practical concern is present whether the case

happens to decide a landmark issue of copyright law or, in the end, turns on matters that have nothing to do with the statute.

Consider that a copyright case may turn solely on a question of fact such as whether the defendant copied a protected work or stumbled on the same jingle by chance. Or a copyright case might be won because the defendant failed to answer the complaint or be lost because of a discovery violation by the plaintiff--civil procedure questions in which copyright law plays no part. Yet in both sets of cases, surely the winner could claim attorney's fees and costs (subject as always to the trial court's discretionary judgment). See McGaughey v. Twentieth Century Fox Film Corp., 12 F.3d 62, 64-65 (5th Cir. 1994).

Plaintiffs also argue that, at a minimum, there should have been an allocation of fees and costs between the copyright and state law claims. If there were any indication that significant extra moneys were expended by the defense because of the presence of state law claims, we would agree that allocation was required. See Entm't Research Group, 122 F.3d at 1230. That could easily be so if, for example, independent issues were raised and litigated as to fraud that were unnecessary to resolving the ownership issue.

Plaintiffs claim that such unrelated issues were raised in the district court and that the district court erred by failing to reduce the award to reflect work done on them. Specifically, plaintiffs say that the parties disagreed as to whether the

plaintiffs would be able to establish "benefit of the bargain" damages on their contract claim and whether such damages were limited to the amount of the purchase price by the terms of the contract. All indications are that these were minor points; but, in any event, the plaintiffs did not make this argument before the district court so it is forfeited. Daigle v. Maine Med. Ctr., Inc., 14 F.3d 684, 687 (1st Cir. 1994).

Plaintiffs next say that the ownership claim was a reasonable one and that the district court should therefore have not awarded attorney's fees. Section 505, quoted in full above, says that the district court "in its discretion may allow the recovery of full costs" including an attorney's fee. Under the case law, dishonesty is not required for an award; even a case that is merely objectively quite weak can warrant such an award. Matthews, 157 F.3d at 29.

This case is perhaps unusual because at first blush it might appear as if the plaintiffs had a colorable claim that Hodges had purchased, and InvesSys now owned, the AIM copyright. The clear language of the written contract, presumed to reflect the parties' intent, explicitly included AIM, and McGraw-Hill obviously exhibited remarkable negligence in failing to detect the apparent error despite its officials' review of the written contract. Further, under the applicable New York law, McGraw-Hill had a

heightened burden to prove the error by clear and convincing evidence.

Nevertheless, the closer one looks at the circumstances, the more dubious plaintiffs' ownership claim appears. Most important is the underlying transaction related to MaPS, which was purchased for a quite modest sum just under $20,000. The DOS-based predecessor programs were added at Hodges' request after the original bargaining and at no additional cost. AIM was _not_ a predecessor program, was not part of MaPS and--most significantly-was generating about $3-4 million per year. Even though there was evidence that McGraw-Hill was planning to replace AIM reasonably soon, the idea that it deliberately intended to transfer a program then generating millions for nothing is perverse.

Still, it might well have made the case arguable if there had been substantial negotiations about the transfer of the AIM program. Yet, while McGraw-Hill admitted that Hodges had approached Manning about the subject and had been told to take it up with Thornton, Thornton testified at trial that he had not offered AIM to Hodges; Hodges said that there was discussion and a deal. It is a fair inference, from both the result and the surrounding circumstances, that the jury and the trial judge both credited Thornton's version of events over Hodges'.

There were other circumstances supporting McGraw-Hill's position. The evidence did not show that a launch date for McGraw-Hill's supposed successor system was so clearly imminent that AIM was going to be obsolete in McGraw-Hill's hands at the time of Hodges' alleged purchase of AIM, nor did the contract contain any provision by which Hodges licensed AIM back to McGraw-Hill so that it could continue, for the present, to service its current AIM clients. It is difficult to believe that McGraw-Hill would have sold an essential component of a multi-million dollar business without such a license back.

Of course, in determining whether to award attorney's fees, the district court's judgment as to the reasonableness of the original claim had to rest on what Hodges knew when he made and pressed his claim and not merely on the unfavorable outcome. Cf. Tang v. State of R.I., Dep't of Elderly Affairs, 163 F.3d 7, 13 (1st Cir. 1998). But in this case, Hodges certainly knew at the outset of the raw facts supporting McGraw-Hill's position (e.g., the disparity between price and value) and also knew in fact whether he had had any detailed negotiations with Thornton about whether AIM should be included in the deal.

So long as the district court correctly stated the legal standard or criteria, review of the award is only for abuse of discretion. Matthews, 157 F.3d at 29; cf. Lotus Dev. Corp., 140 F.3d at 72. Plaintiffs complain that the district court did not

seriously consider the plaintiffs' own evidence in support of the claim; but the district court, having sat through the trial, was fully familiar with the background and the direct testimony of Hodges and Thornton.  We have no basis for overturning the district court's decision that an award was appropriate.

We turn next to one disputed item in the award.  The district court allowed recovery under section 505 of the costs of legal research done using one of the standard services (Westlaw; Lexis).  Plaintiffs have not preserved any claim that the amount was excessive or that research was not needed.  Rather, they urge (as they did unsuccessfully in the district court) that such a cost should be treated as part of law firm overhead (covered by the firm's hourly fee) rather than as a separately reimbursable item.

This is an issue on which the courts have been divided;[3] and, given the ubiquity of computer-aided research in law practice, the issue deserves our full attention.  Section 505, taken alone, is not illuminating: it says only that the court may allow the

_____

[3]Compare, e.g., Uniroyal Goodrich Tire Co. v. Mutual Trading Corp., 63 F.3d 516, 526 (7th Cir. 1995), cert. denied, 516 U.S. 1115 (1996) (holding that expenses paid for computer-assisted research were recoverable), and United Nuclear Corp. v. Cannon, 564 F. Supp. 2d 581, 591-92 (D.R.I. 1983) (Selya, J.) (same), with, e.g., Standley v. Chilhowee R-IV Sch. Dist., 5 F.3d 319, 325 & n.7 (8th Cir. 1993) (holding that the cost of computerized research must be factored into attorneys' hourly rates and is not separately compensable), BD v. Debuono, 177 F. Supp. 201, 209 (S.D.N.Y. 2001) (holding that computerized research expenses are properly considered overhead), and Yankee Candle Co. v. Bridgewater Candle Co., 140 F. Supp. 2d 111, 126 (D. Mass. 2001) (same).

prevailing party "full costs" and may award "a reasonable attorney's fee to the prevailing party as part of the costs." 17 U.S.C. § 505. There is no reason to think that Congress gave any particular thought to computer-aided research.

Although section 505's "full costs" language could be distinguished from more familiar and slightly narrower wording in other fee shifting statutes, e.g., 42 U.S.C. § 1988 (2000) ("the court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee as part of the costs"), the tendency of the courts has been to treat most statutes similarly whether in allowing or disallowing particular items. The starting point in many cases--and the ending point in some--is that another federal statute specifies various taxable "costs" (e.g., "[f]ees of the clerk and marshal" and "[f]ees and disbursements for printing and witnesses"), but the list does not include computer-assisted research. 28 U.S.C. § 1920 (2000); Yasui v. Maui Elec. Co., 78 F. Supp. 2d 1124, 1129-30 (D. Haw. 1999).

Nevertheless, the Supreme Court has endorsed the view that disbursements made by an attorney and ordinarily billed directly to the client (that is, separately from the hourly or fixed fee) can properly be encompassed within the phrase "attorney's fee," see W. Va. Univ. Hosps., Inc. v. Casey, 499 U.S. 83, 87 n.3 (1991); and it is not uncommon for courts to allow such costs as travel, long distance calls, and parking on top of the

-14-

hourly fee.  E.g., <u>Downes</u> v. <u>Volkswagen of Am., Inc.</u>, 41 F.3d 1132, 1144 (7th Cir. 1994); <u>Data Gen. Corp.</u> v. <u>Grumman Sys. Support Corp.</u>, 825 F. Supp. 361, 367-68 (D. Mass. 1993).

In our view, computer-assisted research should be treated similarly and reimbursed under attorney's fee statutes like section 505, so long as the research cost is in fact paid by the firm to a third-party provider and is customarily charged by the firm to its clients as a separate disbursement.  If it saves attorney time to do research this way, probably the hours billed are fewer, <u>Haroco, Inc.</u> v. <u>Am. Nat'l Bank & Trust Co.</u>, 38 F.3d 1429, 1440-41 (7th Cir. 1994); and in any event Westlaw and Lexis are now as much part of legal service as a lawyer's taxi to the courthouse.

Courts that have resisted reimbursement of computer-assisted research as part of attorney's fees have asked why that cost should be distinguished from the law firm's cost of maintaining its law book library--a cost that is customarily treated as overhead to be covered by the hourly or other fee rather than billed as a disbursement.  E.g., <u>Debuono</u>, 177 F. Supp. 2d at 209.  Some courts may also think that, as the hourly fee generically covers "legal research," there is a taint of double billing in charging separately for Westlaw or Lexis.  See <u>Scanlon</u> v. <u>Kessler</u>, 23 F. Supp. 2d 413, 418 (S.D.N.Y. 1998).

The answer to these concerns has something to do with economics but also with history and record-keeping practice.  As

-15-

configured by the provider, computer-aided research is often a variable cost in an individual case--that is, the cost varies (from zero upward) depending on the amount of Westlaw or Lexis service used in the case.  By contrast, the firm pays no more or less for its library books, regardless of whether they are pulled off the shelf for a given law suit, so it is described as a fixed rather than a variable cost.

In professional legal services, variable costs that are both large and easily assigned--especially those paid directly to third-party vendors--tend often to be separately billed to the client; those not so easily assigned or inconvenient to track are covered by the hourly fee.[4]  Separate billing does not mean double billing: the computer services directly paid to Lexis or Westlaw do not reappear in some concealed form as part of the hourly rate. Indeed, if such services were treated as overhead, the hourly rate would likely be higher.

It is common knowledge that large law firms regularly track computer-assisted research costs "by client" (both Westlaw and Lexis make this easy) and then bill clients directly for those

---

[4]In economics, there are efficiency arguments for collecting variable costs from the cost causer-"efficiency" meaning that resources will be used more productively.  Cf. 1 Kahn, The Economics of Regulation: Principles and Institutions 71-72 (1970). But it is impractical to track and collect all variable costs (e.g., yellow pads used by each lawyer), and anyway the hourly fee is a crude proxy for many variable costs (the more hours spent, the more yellow pads used--roughly speaking).

-16-

costs.  See, e.g., Case v. United Sch. Dist. No. 233, 157 F.3d 1243, 1257-58 (10th Cir. 1998); Crosby v. Bowater Inc. Ret. Plan for Salaried Employees of Great N. Paper, Inc., 262 F. Supp. 2d 804, 817 (W.D. Mich. 2003).  The practice being so, we see no reason why such costs--if paid to third-party providers--should not be recovered under section 505.  In sum, we align ourselves with the courts that have allowed computer-assisted research costs to be recovered as a separate item.[5]

   The final claim on appeal, made only by Hodges, is that he did not personally claim ownership of the AIM copyright, so he personally should not have been held liable by the district court for fees and costs imposed under that section.  McGraw-Hill defends the district court's award against Hodges as well as InvesSys, but admits that it has little at stake as to Hodges' personal liability because full recovery by it is assured by the appeal bond covering both plaintiffs.  Still, the issue of Hodges' liability is not moot:  under the judgment, McGraw-Hill is free to collect against Hodges personally.

---

[5]A different problem would be presented if the firm paid a flat monthly fee to Westlaw or Lexis and then allocated amounts among clients; similarly, any markup by the firm would raise questions.  However, the plaintiffs in this case did not make any such claim in the district court, and we take the defendants' brief to assert that the costs in question were simply a straight pass-through of time-based charges paid to the service providers for work done in this case.

Hodges' argument rests on the proposition that only the owner of a copyright may sue for infringement under the Copyright Act, and, because Hodges had previously transferred any ownership interest he had in AIM to his corporation, he therefore could not properly claim under the Copyright Act but only under state law (e.g., for fraud or breach of contract). This might be beside the point if Hodges had in this case purported to claim under the Copyright Act, but in this instance the complaint--although somewhat ambiguous--suggests that only InvesSys was claiming under the Copyright Act.

The statute says that the court may allow "full costs" "against any party" (other than the government or its officers) and that this may include attorney's fees in favor of the prevailing party. 17 U.S.C. § 505. At first blush one might think that this gives the district court carte blanche to award attorney's fees against anyone on the losing side as to any claim "in any civil action under" the Copyright Act--the subject matter with which section 505 deals--but this is surely too broad a reading.

A civil action in which a federal copyright claim is asserted arises "under" the Copyright Act, see T.B. Harms Co. v. Eliscu, 339 F.2d 823, 828-29 (2d Cir. 1964), cert. denied, 381 U.S. 915 (1965), regardless of whether non-copyright claims are asserted as well. Yet, Congress' obvious concern in section 505 was in facilitating the assertion and defense of copyright claims--not

-18-

other kinds of claims.  <u>Cf.</u> <u>Entm't Research Group</u>, 122 F.3d at 1230, 1232; <u>Yankee Candle</u>, 140 F. Supp. 2d at 122-23.

This is why courts implementing section 505 tend almost automatically to allocate attorney's fees and costs between copyright and non-copyright claims where this can feasibly be done, limiting recovery to costs causally associated with the copyright claim.  <u>E.g.</u>, <u>Yankee Candle</u>, 140 F. Supp. 2d at 122-123.  There was no apportionment here only because the litigated issue was common to both copyright and non-copyright claims, so the same costs would have been incurred for the former alone.

The same apportionment philosophy ought presumptively to guide liability as among parties.  If Hodges had no association with the copyright claim but were a party to the case for unrelated reasons,  an award of attorney's fees against Hodges under section 505 would be improper even though McGraw-Hill would still have prevailed against InvesSys in an action "under" the Copyright Act.  Such a situation is not that difficult to imagine, given that federal joinder rules tend to be generous as to both parties and claims.  <u>See</u> Fed. R. Civ. P. 18, 20.

However, this does not mean that Hodges ought automatically be exempted from liability merely because he is not properly a claimant under the Copyright Act and did not explicitly assert such a copyright claim in the complaint.  In this instance, Hodges was a party to the complaint but not only that:  he was

-19-

intimately involved in the transaction allegedly giving rise to the copyright claim, owned the company asserting the claim, was a key witness in fostering the claim in this case, and stood to benefit substantially if the imposture had succeeded.

Under such circumstances, we think that section 505's policy, as well as its language, permits the award to run against Hodges as well as against InvesSys. Hughes v. Novi American, Inc., 724 F.2d 122, 126 (Fed. Cir. 1984), may lend a measure of support to this view; in any event, nothing flatly to the contrary has been cited to us. Hodges was peculiarly responsible for this copyright claim on several different levels and was a party to that case and the deterrence policy of the statute well fits his conduct. That is enough for this case. Future decisions will have to mark out the boundary as new fact situations present themselves.

There are certainly arguments for a flat rule that only a losing party formally on one side of a copyright claim can be held liable for costs under section 505. It would be easy to administer and avoid possible asymmetries; if Hodges had not been a party then (veil piercing aside) he would not be liable even though equally "responsible" for the claim. But such a mechanical approach would also be a judicial creation, since the statute's language imposes no such flat rule; and it would be less responsive to the underlying policies. Imagine that there had been no appeal bond and InvesSys had no assets of its own.

-20-

This case was well handled and properly decided. However, whatever fault can be imputed to the plaintiffs for making the claim, all but one of the issues raised on appeal presented serious legal questions, and the appeal was legitimately pursued. We have no inclination to make a separate award of attorney's fees to McGraw-Hill for work done on the appeal, although the usual award of statutory costs is allowed.

Affirmed.